**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**

| | |
|---|---|
| NATIONAL ASSOCIATION OF MANUFACTURERS<br><br>and<br><br>NATURAL GAS SERVICES GROUP, INC.,<br><br>                 Plaintiffs,<br><br>v.<br><br>UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>and<br><br>GARY GENSLER, in his official capacity as Chair of the SEC,<br><br>                 Defendants. | No. 7:21-cv-183 |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1.     The American public markets have long served as our nation's essential engine of economic growth, financing corporate investment in infrastructure, research, and the human talent that propels business success. The country as a whole reaps the benefits: Expanding businesses create millions of jobs; this growth lifts the national economy; and individual investments in the public markets secure the retirements of Americans across the country.

2.     In exchange for the investment of capital, publicly traded companies generally provide shareholders the right to participate in the most substantial questions of corporate governance. Shareholders are often called upon to elect directors, approve mergers or acquisitions, and determine the issuance of dividends, along with a host of other important issues. Many of these votes are cast via proxy by institutional investors and investment advisers, who make both

investing and voting decisions on behalf of the everyday Americans whose retirement and other investments they manage.

3.      Vibrant public markets thus depend on productive engagement between company management and shareholders. And for shareholders or their proxies to make informed decisions, they must possess accurate information. Accordingly, the transmission of correct information is essential to both securities issuers and investors.

4.      Certain entities, often called proxy advisory firms, now issue proxy voting advice regarding a wide array of publicly traded companies. These proxy advisory firms purport to advise institutional investors, investment advisers, and numerous other stakeholders as to how their votes should be cast. Today, these entities—largely a duopoly of two firms, Institutional Shareholder Services (ISS) and Glass Lewis—wield outsized influence on proxy voting.

5.      Grave concerns have arisen as to whether these firms, which issue advice intentionally impacting the nation's public markets, nonetheless harbor significant conflicts of interest. ISS, for example, sells corporate governance consulting services to the very same companies about which it makes proxy voting recommendations on the basis of its governance policies, creating strong incentives for companies to purchase its consulting services.

6.      What is more, the recommendations issued by these proxy advisory firms have been criticized for routinely providing investors and other proxy voters with false and misleading information. This creates an unacceptable potential for critical corporate decisions to be made on the basis of inaccurate or incomplete facts. And proxy advisory firms have frequently been unwilling to issue corrections even when they are notified of errors in their reporting.

7.      Further, proxy advisory firms often fail to provide any transparency regarding the creation of their putative corporate governance standards—and how those standards are related to the creation of value for shareholders. Instead, these firms often adopt one-size-fits-all governance positions, without any analysis as to whether these measures would enhance value for the *specific* company they are evaluating.

8.    Proxy advisory firms regularly engage in practices that directly translate their recommendations into voting power, such as a practice known as "robo-voting," through which the firms directly cast their clients' votes (rather than just providing voting recommendations). These practices not only deny companies the opportunity to meaningfully respond to proxy advisory firms' reports, but also compound any conflicts or errors that the reports contain.

9.    In view of these serious concerns, the United States Securities and Exchange Commission (SEC) extensively investigated whether it should implement basic safeguards with respect to proxy voting advice. After collecting numerous examples of voting advice offered notwithstanding an undisclosed conflict of interest, as well as examples of routine inaccurate information, the SEC promulgated a rule—the Proxy Advice Rule—to impose modest protections for investors and issuers alike. *See generally Exemptions from the Proxy Rules for Proxy Voting Advice*, 85 Fed. Reg. 55,082 (Sept. 3, 2020) (Proxy Advice Rule).

10.    In summary, the Rule clarifies that the provision of proxy voting advice generally constitutes a solicitation under the federal proxy rules. Usually, entities soliciting a proxy are subject to various information and filing requirements. The Rule exempts proxy firms from these requirements, provided that they disclose potential conflicts of interest to their clients, supply companies subject to their analyses with information about their final voting recommendations, and notify their clients prior to the vote if the subject companies respond to their recommendations. It also subjects proxy firms to the federal proxy rules' antifraud provisions. The Rule thus functions as an exemption to more burdensome requirements to which the proxy firms' activity would normally subject them under federal law.

11.    As an accommodation to the interests of the proxy advisory firms, the SEC set a compliance date of December 1, 2021 for the proxy firms to meet the exemption conditions, over a year after the Rule became final. This particular compliance date was likely selected in view of the timing of the annual proxy season, which takes place during the spring of each year for most companies. Thus, the Rule permitted proxy firms to continue their existing, pre-Rule practices for

the spring 2021 proxy season, but—unless changed—would require them to comply with the Rule's disclosure and other modest requirements for the spring 2022 proxy season.

12.     Following the confirmation of a new Chair in April 2021, however, the SEC abruptly changed course. In a series of connected actions, the SEC has suspended the compliance date for the new safeguards—thus permitting proxy advisory firms to continue to (1) operate outside SEC rules designed to protect investors from false and misleading statements (to which the firms became subject on November 2, 2020) and (2) provide proxy voting advice without notifying their clients of material conflicts of interest or responses to their recommendations (pursuant to the Rule's exemptions for proxy voting advice, which will become effective on December 1, 2021). In other words, the SEC has now permitted proxy firms to avoid compliance with the exact reforms and precautions that it determined just last year were necessary to protect investors.

13.     This action immediately harms publicly traded companies and their shareholders, precluding them from receiving the disclosures that the SEC earlier determined were essential to protect the public markets.

14.     The SEC's suspension of the Proxy Advice Rule is flatly unlawful. The SEC may not decide that it no longer stands by a regulation it earlier lawfully promulgated, and—absent any rulemaking process—simply suspend its application. To the contrary, the procedural provisions of the Administrative Procedure Act (APA) exist precisely to bring regularity to agency action.

15.     In particular, the APA requires an agency to engage in notice-and-comment rulemaking *any* time it revises a legislative regulation, including when it wishes to suspend the regulation's effective or compliance date—which is just as much part of the regulation as its substantive provisions. This requirement enables the public to participate in the agency's lawmaking process, providing the agency with vital information and viewpoints, which the agency must in turn duly consider. Because the SEC did not follow those procedures here, its attempt to unilaterally suspend the Proxy Advice Rule is unlawful. The Court should therefore set aside the SEC's illegal action.

## PARTIES

16.    Plaintiff National Association of Manufacturers (NAM) is the largest manufacturing association in the United States, representing small and large manufacturers in every industrial sector and in all 50 states. Manufacturing employs more than 12 million men and women, contributes roughly $2.3 trillion to the U.S. economy annually, has the largest economic impact of any major sector, and accounts for nearly two-thirds of private-sector research and development in the Nation. The NAM is the voice of the manufacturing community and the leading advocate for a policy agenda that helps manufacturers compete in the global economy and create jobs across the United States.

17.    Many of the NAM's members are publicly traded corporations. Part of the NAM's mission, accordingly, is to advocate for rules that ensure accurate and transparent information is provided to these businesses and their shareholders in the context of annual shareholder meetings, at which critical decisions are made that impact the governance of public companies and the performance of their shareholders' investments. That is, the NAM's members have an interest in ensuring that, when third parties seek to provide advice as to how shareholders and their proxies vote on matters of corporate governance, the information provided is accurate and conflicts of interest are appropriately disclosed. For that reason, the NAM advocated for the Proxy Advice Rule, which is of the utmost concern to many of its members. *See, e.g.*, Comment of the National Association of Manufacturers, File No. S7-22-19, Amendments to Exemptions from the Proxy Rules for Proxy Voting Advice (Feb. 3, 2020), perma.cc/CSA2-XEUN; File No. 4-725: *SEC Staff Roundtable on the Proxy Process*, Ltr. to Brent J. Fields (Mar. 5, 2019), perma.cc/S6QU-UDVS; *Meeting with National Association of Manufacturers*, File No. S7-22-19 (May 7, 2020), perma.cc/P3XC-8WZ6.

18.    Likewise, numerous members of the NAM have either provided their own comments on the Proxy Advice Rule, urging the SEC to adopt protections to promote transparent and accurate information, or have been forced to file supplemental proxy materials with the SEC identifying and correcting errors, omissions, and misrepresentations in proxy advisory firms'

proxy analyses and voting recommendations.[1] The Proxy Advice Rule, if properly implemented, would remediate the injuries to public companies upon the issuance of erroneous or conflicted advice. Ultimately, many of the NAM's members are harmed by the SEC's unlawful decision to unlawfully suspend the compliance date of the Rule, an action that allows proxy advisory firms to violate duly promulgated law.

19.    The NAM is a 501(c)(6) nonprofit organization headquartered in Washington, D.C.

20.    Plaintiff Natural Gas Services Group, Inc. (NGS) is a leading provider of gas compression equipment to the natural gas industry. NGS is incorporated in Colorado and has its headquarters and principal place of business in Midland, Texas. Its common shares are publicly traded on the New York Stock Exchange.

21.    Over the past several years, NGS has been the subject of repeated materially misleading or factually incorrect proxy advice from proxy advisory firms. Indeed, NGS has been forced to file supplemental proxy statements in response to this misleading proxy advice in seven of the past eight annual proxy seasons, often on unreasonably short timeframes. This process has required NGS's employees, primarily senior executives, to divert significant time and effort away from running the business in order to correct proxy firms' misleading or incorrect statements. It has also required NGS to make hard expenditures, including payments to outside consultants. The Proxy Advice Rule at issue here would significantly mitigate the costs imposed on NGS by the pre-Rule status quo; for example, it would decrease the costs associated with providing correct information to shareholders following a misleading proxy firm recommendation.

---

[1]    *See, e.g.*, Abbot Laboratories supplemental proxy statement, perma.cc/AUB2-7ZMA; American Outdoor Brands Corporation supplemental proxy statement, perma.cc/C93J-KJMW; Ball Corporation comment letter, perma.cc/496F-VRBE; Ecolab Inc. comment letter, perma.cc/2DKG-LNJY; Exxon Mobil Corporation supplemental proxy statement, perma.cc/HY2K-83JJ; Exxon Mobil Corporation comment letter, perma.cc/D4WS-X9YJ; FedEx Corporation comment letter, perma.cc/4L3L-Z3SU; Garmin Ltd. comment letter, perma.cc/WJS6-3WRL; Kirby Corporation supplemental proxy filing, perma.cc/K5NJ-M7K9; Kirby Corporation supplemental proxy filing, perma.cc/F5LJ-YR3J; PACCAR Inc. comment letter, perma.cc/D7MQ-NCHB; Union Pacific Corporation supplemental proxy filing, perma.cc/BL3L-WNK2.

22.     Defendant United States Securities and Exchange Commission (SEC) is the federal agency charged with securities regulation.

23.     Defendant Gary Gensler is the SEC Chair. He is sued in his official capacity.

## JURISDICTION AND VENUE

24.     Plaintiffs bring this suit under the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.*, the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, and this Court's inherent equitable powers.

25.     The court's jurisdiction over is invoked under 28 U.S.C. § 1331, as this case arises under the laws of the United States.

26.     Venue is proper in this district under 28 U.S.C. § 1391(e) because Plaintiff NGS resides in this district, and no real property is involved in this action.

## FACTUAL ALLEGATIONS

**A.     Proxy voting advice businesses, and the SEC's obligation to regulate them.**

27.     The most important corporate governance decisions facing public companies are made at shareholder meetings—yet few shareholders vote their own shares directly. To the contrary, "today's financial markets . . . are characterized by significant intermediation and institutional investor participation," and "proxies have become the predominant means by which shareholders of publicly traded companies exercise their right to vote on corporate matters." Proxy Advice Rule, 85 Fed. Reg. at 55,083.

28.     With the increasing importance of proxy voting, particularly by institutional investors and intermediaries, proxy advisory firms "have come to play an important role in the proxy voting process." Proxy Advice Rule, 85 Fed. Reg. at 55,083. Such firms "typically provide investment advisers, institutional investors, and other clients with a variety of services that relate to the substance of voting decisions," including "research and analysis regarding the matters subject to a vote," promulgating "benchmark voting policies" or "specialty voting policies . . . such as a socially responsible policy," and "making specific voting recommendations to their clients on

matters subject to a shareholder vote," including "based on the proxy voting advice business's benchmark or specialty policies." *Id.* "This advice is often an important factor in the clients' proxy voting decisions." *Id.* In addition to voting policies and voting recommendations, in some instances the firms "are given authority to execute votes on behalf of their clients." *Id.*

29.    Indeed, because of the ubiquity of proxy voting and the sheer number of votes that must be taken by institutional investors and large intermediaries, proxy advisory firms "have become uniquely situated in today's market to influence, and in many cases directly execute, these investors' voting decisions." Proxy Advice Rule, 85 Fed. Reg. at 55,083.

30.    That level of ubiquitous involvement in corporate governance, however, has led to widespread concern about the practices and influence of the proxy advisory industry, "focused on the accuracy and soundness of the information and methodologies used to formulate proxy voting advice businesses' recommendations as well as potential conflicts of interest that may affect those recommendations." *Amendments to Exemptions from the Proxy Rules for Proxy Voting Advice*, 84 Fed. Reg. 66,518, 66,520 (Dec. 4, 2019) (Proposed Rule).

31.    In particular, proxy advisory firms operate with significant undisclosed conflicts of interest. "Proxy voting advice businesses engage in activities or have relationships that could affect the objectivity or reliability of their advice, which may need to be disclosed in order for their clients to assess the impact and materiality of any actual or potential conflicts of interest with respect to a voting recommendation." Proposed Rule, 84 Fed. Reg. at 66,525. For example, ISS, one side of a virtual duopoly in the proxy advice industry, sells corporate governance consulting services to the very same companies about which it makes proxy voting recommendations on the basis of its governance policies, creating strong incentives for companies to purchase its consulting services.

32.    Indeed, Plaintiff NGS itself has received repeated solicitations and marketing materials from ISS's corporate governance consulting arm, even as ISS has consistently issued negative recommendations on NGS's shareholder-voting proposals.

33.    The SEC has described these and other circumstances in which conflicts of interest arise for proxy advisory firms. Proposed Rule, 84 Fed. Reg. at 66,525. For example, as noted, a

proxy advisory firm such as ISS "provid[es] voting advice to its clients on proposals to be considered at the annual meeting of a registrant while . . . also earn[ing] fees from that registrant for providing advice on corporate governance and compensation policies." *Id.* Or, a conflict might arise where a proxy advisory firm provides "voting advice on a matter in which its affiliates or one of its clients has a material interest, such as a business transaction or a shareholder proposal put forward by that client." *Id.* The SEC also identified the situation in which a proxy advisory firm provides "ratings to institutional investors of registrants' corporate governance practices while at the same time consulting for the registrants that are the subject of the ratings to help increase their corporate governance scores." *Id.* And finally, the SEC noted that a conflict might arise when a proxy advisory firm provides "voting advice with respect to a registrant's shareholder meeting while affiliates of the business hold a significant ownership interest in the registrant, sit on the registrant's board of directors, or have relationships with the shareholder presenting the proposal in question." *Id.*

34.    The Government Accountability Office has also explained that ISS's business model is likely to present precisely these sorts of conflicts. U.S. Gov't Accountability Off., GAO-07-765, *Corporate Shareholder Meetings: Issues Relating to Firms that Advise Institutional Investors on Proxy Voting* at 4 (2007), perma.cc/YTF3-ZX5Z.

35.    These concerns are more than merely theoretical. For example, a recent empirical study concludes that such conflicts regularly occur in practice and have negative real-world consequences for shareholder value. Tao Li, *Outsourcing Corporate Governance: Conflicts of Interest Within the Proxy Advisory Industry*, 64 Management Sci. 2473 (2016).

36.    Similarly, "in recent years concerns have been expressed by a number of commentators . . . that there could be factual errors, incompleteness, or methodological weaknesses in proxy voting advice businesses' analysis and information underlying their voting advice that could materially affect the reliability of their voting recommendations and could affect voting outcomes." Proposed Rule, 84 Fed. Reg. at 66,528. And these risks are enhanced by the lack of any requirement, prior to the Rule at issue here, that proxy advisory firms give notice of their

analysis to the public company in question in a way that allows the company to respond to or rebut that analysis, so that the proxy firms' clients can make fully informed decisions on behalf of the investors whose accounts they manage. *See id.* at 66,529. Additionally, proxy advisory firms are reluctant to correct material errors in reports even once they are made aware of such inaccuracies.

37.     In 2013 and 2018, two surveys of CEOs demonstrated that nearly all respondents had "found one or more factual errors in reports prepared by proxy advisory firms about their companies." Business Roundtable, *Comment Letter on Proposed Rule* at 11 (Nov. 9, 2018), perma.cc/46JJ-F9SR. Moreover, "[t]he 2018 survey results further indicate that although 90 percent of companies notify the proxy advisory firms of the errors, only 8 percent of companies find that the errors are consistently corrected." *Id.*

38.     Similarly, data from 2016, 2017, and 2018 show that proxy advisory firms' reports on nearly one hundred companies included numerous factual errors. Frank M. Placenti, *Analysis of Proxy Advisor Factual and Analytical Errors in 2016, 2017, and 2018* (2018), perma.cc/RGR3-YR6X.

39.     Plaintiff NGS has repeatedly been the subject of inaccurate information circulated by proxy advisory firms. In 2021, for example, ISS urged shareholders to vote against the reelection of a particular director, supposedly on the basis of his lack of responsiveness to alleged concerns regarding an earlier say-on-pay proposal. But the director in question was not on the compensation committee at the time of the action to which ISS objected, demonstrating that its advice was false and materially incomplete.

40.     This error was hardly all. In 2015, ISS stated that NGS did not disclose a compensation clawback policy. But such a provision plainly appears in the CEO's earlier-disclosed employment agreement. And similar additional errors abound. For each, NGS was obligated to spend time and resources correcting ISS's errors and providing correct information to its shareholders. The Proxy Advice Rule, if implemented, would at minimum reduce the errors to which NGS would be subject and would mitigate the costs shouldered by NGS in providing accurate information to correct proxy firms' misinformation.

41.    NGS has repeatedly been the subject of proxy advice replete with not only objective factual errors, but also misleading, one-size-fits-all analysis that fails to appreciate the nature of NGS's business and the industry in which it operates. Specifically, ISS has frequently urged NGS's shareholders to vote against management proposals based on comparisons to ISS-selected "peer groups" that have little to nothing in common with NGS apart from their (often marginal) participation in the overall energy industry, with no regard to the particular segment of that industry in which NGS operates or the relative market capitalization of NGS and its supposed peer firms. For example, ISS deems a company called ENGlobal a peer of NGS for executive compensation purposes—despite that ENGlobal is an engineering consulting firm, with a market capitalization of $40 million, and whose CEO owns 31% of the company and receives a nominal salary, while NGS is far afield from ISS's purported peer as to every one of those characteristics.

42.    The manifest discrepancies between ISS's analysis and similar analysis using NGS's actual peer firms—which are readily identifiable—indicate that ISS is failing to provide complete and accurate information to NGS shareholders.

43.    Moreover, because ISS's voting recommendations are generally issued unreasonably close to the date of the relevant shareholder meetings, the timing of such recommendations has left NGS with little opportunity to respond. Instead, NGS's management and executives have been forced to scramble to rebut the proxy firm's misleading analysis on an unreasonably accelerated timeframe—all while shareholders are actively voting—putting the company at a distinct disadvantage in effectively communicating with its shareholders. In certain cases, NGS has had to triage which piece of incorrect or misleading advice to respond to, as there was simply no time to rebut each of the proxy firm's mistaken recommendations.

44.    ISS also evaluates companies' profitability using a proprietary, black-box metric called Economic Value Added (EVA), rather than Generally Accepted Accounting Principles (GAAP) measures or other commonly used metrics, such as EBITDA, that are available to the companies themselves. This non-standard, non-transparent evaluation procedure both increases the difficulties for companies attempting to respond to ISS's analysis on an already tight

timeframe, and also ratchets up the pressure, discussed above, for companies to retain ISS's consulting arm. It further leads to enhanced risk of inaccurate or misleading information being provided to shareholders.

45.     Proxy advisory firms also engage in electronic voting practices commonly referred to as "robo-voting." *See* Richard Levick, *'Vinny' and the Proxy Advisors: A Five Trillion Dollar Debate*, Forbes.com (Dec. 17, 2018), perma.cc/J388-5CR5. While voters can manually opt out, proxy advisory firms establish default voting behaviors and automatically submit shareholder votes without the voter taking any action whatsoever to confirm, approve, or submit votes. *See* Letter from the National Investor Relations Institute to Jay Clayton, Chair, U.S. Securities and Exchange Commission (Aug. 3, 2017), perma.cc/U6QV-JY4E; *see also* Timothy M. Doyle, *The Realities of Robo-Voting*, Am. Council for Capital Formation (Nov. 2018), perma.cc/H9T4-Y9PV. In addition to the self-evident procedural problems with casting votes through default procedures, robo-voting compounds any potential conflicts or inaccuracies by translating recommendations directly into voting power.

46.     The Exchange Act obligates the SEC to comprehensively regulate the public securities markets. Congress was especially concerned with the solicitation of proxies, seeking to ensure that proxy solicitations involve accurate and transparent information. Section 14(a) of the Exchange Act makes it unlawful for any person to "solicit . . . any proxy or consent or authorization" with respect to publicly traded securities "in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. 78n(a)(1). At the time of the statute's enactment, the word "solicit" ordinarily meant both (1) to "endeavor to obtain" an action, and (2) to "awake or excite to action." Black's Law Dictionary 1639 (3d ed. 1933). Given that proxy advisory firms endeavor to obtain votes in accord with its recommendations—indeed, if often submits its clients' votes pursuant to its own advice—they fall squarely within the scope of what Congress sought to govern. The SEC, accordingly, is *obligated* to regulate proxy advisory firms. Indeed, as the SEC

described in the *ISS* litigation,[2] "[t]he Commission has long considered proxy voting advice to generally constitute a 'solicitation' within the meaning of Section 14(a)" Cross-Mot. for S.J., *ISS v. SEC*, at 6, No. 19-cv-3275 (D.D.C. Oct. 30, 2020), Dkt. 35-1.

      **B.     The SEC promulgates the Proxy Advice Rule.**

      47.     Particularly "[g]iven proxy voting advice businesses' potential to influence the voting decisions of investment advisers and other institutional investors, who often vote on behalf of others," the SEC in 2019 became "concerned about the risk of proxy advice businesses providing inaccurate or incomplete voting advice (including the failure to disclose material conflicts of interest) that could be relied upon to the detriment of investors." Proposed Rule, 84 Fed. Reg. at 66,520. As the SEC has described, proxy firm voting is now "widely used," is "typically delivered shortly before the shareholder meeting," and "is often an important factor in shareholder voting decisions that can sway outcomes." Cross-Mot. for S.J., *ISS v. SEC*, at 2, No. 19-cv-3275 (D.D.C. Oct. 30, 2020), Dkt. 35-1. Moreover, "as institutional investors have come to hold a significant and increasing number of shares, proxy voting advice businesses have become uniquely situated to influence, and in many cases directly execute, these investors' voting decisions." *Id*. at 15. The SEC thus took action "in response to these market developments." *Id*. at 2.

      48.     In 2020, therefore, the SEC decided to provide proxy advisory firms with modest conflict-of-interest disclosure and transparency compliance options, "so that investors who use proxy voting advice receive more transparent, accurate, and complete information on which to make their voting decisions." Proxy Advice Rule, 85 Fed. Reg. at 55,082. That is, the Rule is not an attempt to regulate "all aspects of the proxy advice businesses' role in the proxy process"; rather, it is narrowly focused on "certain specific concerns about proxy voting advice businesses and would help to ensure that the recipients of their voting advice make voting determinations on the basis of materially complete and accurate information." Proposed Rule, 84 Fed. Reg. at 66,521.

---

[2]    As we describe below (*see infra* ¶ 54 ), ISS sued the SEC to enjoin the Proxy Advice Rule.

49.     In particular, the Rule "codif[ied]" the SEC's existing "interpretation that proxy voting advice generally constitutes a solicitation with the meaning of Exchange Act Section 14(a) and therefore is subject to the Federal proxy rules." Proxy Advice Rule, 85 Fed. Reg. at 55,083; *see* 17 C.F.R. § 240.14a-1(*l*)(1)(iii)(A). And it "condition[ed] the availability of certain existing exemptions from the information and filing requirements of the Federal proxy rules commonly used by proxy voting advice businesses upon compliance with additional disclosure and procedural requirements." Proxy Advice Rule, 85 Fed. Reg. at 55,083-55,084. As the SEC explained in litigation, "[t]hese conditions establish industry-wide minimum conflict of interest disclosure standards. And they help ensure that investors who use proxy voting advice have access to more transparent, accurate, and complete information, as well as the kind of robust discussion that would occur if all parties attended a shareholder meeting in person." Cross-Mot. for S.J., *ISS v. SEC*, at 2, No. 19-cv-3275 (D.D.C. Oct. 30, 2020), Dkt. 35-1.

50.     Specifically, the Rule requires proxy advisory firms wishing to avoid complying with the proxy rules' information and filing requirements to (a) disclose to their clients "any information regarding an interest, transaction, or relationship . . . that is material to assessing the objectivity of the proxy voting advice"; (b) disclose their proxy voting advice to the public companies that are the subject of the advice; and (c) provide their clients a mechanism through which they can become aware when a company responds to the firm's advice. 17 C.F.R. § 240.14a-2(b)(9)(i), (ii). That is, the proxy advisory firm need only disclose potential conflicts of interest and permit the company that is the subject of its voting advice to view and provide timely responses to its recommendations to the firm's clients.

51.     The Rule also clarifies that proxy advisory firms' voting advice is generally subject to the Federal proxy rules' antifraud provisions and that the firms' "failure to disclose certain material information about proxy voting advice, specifically information about the proxy voting advice business's methodology, sources of information, and conflicts of interest" could be considered "misleading." Proxy Advice Rule, 85 Fed. Reg. at 55,139.

52.     Recognizing that proxy firms would need time to adapt to the new requirements, the Rule allowed a "transition period." Proxy Advice Rule, 85 Fed. Reg. at 55,122. While the Rule's codification that the definition of "solicitation" generally encompasses proxy voting advice, as well as the Rule's antifraud standards, took effect on November 2, 2020, the Rule provided that "proxy voting advice businesses will not be required to comply" with its disclosure and other requirements "until December 1, 2021," more than a year after the Rule was published and became effective. *Id.* at 55,082, 55122.

53.     Proxy advisory firms can hardly be surprised about this Rule. In 1991, ISS itself proclaimed that "ISS believes that informed voting decisionmaking will be facilitated if an issuer's response to its proxy analyses and voting advice can be incorporated into its products. Securityholders will then have the dual benefit of ISS's objective analysis and advice coupled with the issuer's critique thereof." Ltr. from ISS to SEC re Exchange Act Release No. 29315, at 3 (Aug. 1, 1991). And it has previously recognized that its activities are subject to the proxy rules. *See* Proxy Advice Rule, 85 Fed. Reg. at 55,094.

### C.     The SEC suspends the Proxy Advice Rule.

54.     The proxy advisory industry responded adversely and aggressively to these modest efforts to enhance accuracy and transparency. Indeed, ISS, one of the largest proxy advisory firms, sued the SEC, seeking to set aside the Rule. *See generally Institutional Shareholder Services Inc. v. SEC*, No. 19-cv-3275 (D.D.C.). At that time, the SEC defended its Rule. Because of its compelling interests in this area, the NAM moved for intervenor status in that litigation.

55.     Shortly after Defendant Gary Gensler was sworn into office as the new chair, however, the SEC abruptly changed course through a series of concerted actions on June 1, 2021.

56.     First, Defendant Gensler issued a public statement "directing [SEC] staff to . . . consider whether to recommend that the Commission revisit its 2020 codification of the definition of solicitation as encompassing proxy voting advice, the 2019 Interpretation and Guidance regarding that definition, and the conditions on exemptions from the information and filing

requirements in the 2020 Rule Amendments." Gary Gensler, SEC Chair, *Statement on the Application of the Proxy Rules to Proxy Voting Advice* (June 1, 2021), perma.cc/AZK5-6LND (Exhibit A).

57.     Second, the SEC's Division of Corporation Finance issued a statement that same day, stating that "the Division of Corporation Finance has determined that it will not recommend enforcement action based on . . . the 2020 Rule Amendments"—that is, the Proxy Advice Rule— "during the period in which the Commission is considering further regulatory action in this area." SEC Division of Corporation Finance, *Statement on Compliance with the Commission's 2019 Interpretation and Guidance Regarding the Applicability of the Proxy Rules to Proxy Voting Advice and Amended Rules 14a-1(1), 14a-2(b), 14a-9* (June 1, 2021), perma.cc/GH2B-YSJ4 (Exhibit B). In other words, the SEC effectively suspended the compliance date for the Proxy Advice Rule.

58.     Third—also that same day—the SEC moved to hold the *ISS* litigation in abeyance, pending the SEC's reconsideration of the Proxy Advice Rule. Critically, the SEC represented that, "in the meantime . . . the Division's no-action statement *provides ISS (as well as other proxy voting advice businesses) relief from the December 1, 2021 compliance date*." Mtn. for Abeyance, *Institutional Shareholder Services Inc. v. SEC*, No. 19-cv-3275 (D.D.C. June 1, 2021), Dkt. 53, at 4 (emphasis added) (Exhibit C). No doubt based on this representation, the SEC reported that "ISS consents to holding the case in abeyance." *Id*. at 1.

59.     That is, the SEC told the court that its statements were not merely advisory or subject to discretion, but affirmatively "provide[] . . . proxy voting advice businesses[] relief" from having to comply with the Proxy Advice Rule starting December 1, 2021, as the duly promulgated Rule provides. Ex. C, at 4. And ISS—which had sued the SEC to challenge the Rule—accordingly agreed to hold the litigation in abeyance. As such, the SEC is now judicially estopped from arguing otherwise. *See generally New Hampshire v. Maine*, 532 U.S. 742, 749-751 (2001).

60.     Taken together, these actions constitute a suspension or a stay of the Proxy Advice Rule. While the Rule obligated proxy advisory firms to comply with the Rule's disclosure and

procedural requirements by December 1, 2021, these SEC actions have amended that obligation, indefinitely delaying any requirement that proxy firms comply with the law.

**D.    The SEC's suspension of the Proxy Advice Rule is unlawful.**

61.    The SEC's suspension of the Proxy Advice Rule's compliance dates is blatantly unlawful under the Administrative Procedure Act. An agency "may not alter" a duly promulgated final rule "without notice and comment, nor does it have any inherent power to stay a final rule." *Nat'l Venture Capital Ass'n v. Duke*, 291 F. Supp. 3d 5, 15 (D.D.C. 2017) (quoting *Clean Air Council v. Pruitt*, 862 F.3d 1, 9 (D.C. Cir. 2017)). And "an order delaying [a] rule's effective date . . . [is] tantamount to amending or revoking a rule." *Clean Air Council*, 892 F.3d at 6; *see also, e.g.*, *Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 113 (2d Cir. 2018) (notice and comment requirements "apply with the same force when an agency seeks to delay . . . a previously promulgated final rule.").

62.    Lawfully delaying the compliance date of the Proxy Advice Rule thus would have required the SEC to utilize the APA's notice and comment procedures. But the SEC did not do so—indeed, it did not even attempt to do so. The APA therefore requires that the SEC's purported suspension of the compliance date for the Proxy Advice Rule be set aside.

**CLAIM FOR RELIEF**

**Count I**
**Administrative Procedure Act – unlawful amendment of a binding regulation**

63.    Plaintiffs incorporate and re-allege the foregoing paragraphs as though fully set forth herein.

64.    Outside of a few narrowly defined exceptions, the Administrative Procedure Act permits agencies to issue binding rules only after notice to the public and consideration of public comments. 5 U.S.C. § 553 (requiring "[g]eneral notice of proposed rule making . . . in the Federal Register" and "an opportunity [for the public] to participate in the rule making through submission of written data, views, or arguments").

65.     The notice and comment requirements "apply with the same force when an agency seeks to delay . . . a previously promulgated final rule." *E.g.*, *Nat. Res. Def. Council*, 894 F.3d at 113.

66.     The APA empowers courts to "hold unlawful and set aside agency action" that is undertaken "without observance of procedure required by law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2).

67.     By purporting to delay the compliance date for the Proxy Advice Rule without providing notice and an opportunity for public comment pursuant to the APA, the SEC has acted "without observance of procedure required by law" and "otherwise not in accordance with law." 5 U.S.C. § 706(2). The agency's purported suspension of the compliance date must therefore be "set aside." *Id.*

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs National Association of Manufacturers and Natural Gas Services Group, Inc., respectfully request that the Court enter judgment in their favor and that the Court:

(a.)     "[S]et aside" Defendants' suspension of the compliance date for the Proxy Advice Rule pursuant to the Administrative Procedure Act, *see* 5 U.S.C. § 706(2);

(b.)     Issue a declaratory judgment declaring that Defendants' suspension of the compliance date for the Proxy Advice Rule is unlawful and void;

(c.)     Enjoin Defendants from enforcing or otherwise carrying out the suspension of the compliance date for the Proxy Advice Rule;

(d.)     Award Plaintiffs such other and further relief as the Court may deem just and proper.

Dated: October 13, 2021

Respectfully submitted,

/s/ *Debbie E. Green*

Patrick D. Hedren (*pro hac vice* to be filed)
Erica T. Klenicki (*pro hac vice* to be filed)
NAM LEGAL CENTER
733 10th Street NW, Suite 700
Washington, DC 20001
(202) 637-3000

*Counsel for the National Association of
  Manufacturers*

Paul W. Hughes (*pro hac vice* to be filed)
Andrew A. Lyons-Berg (*pro hac vice*
  to be filed)
MCDERMOTT WILL & EMERY LLP
500 North Capitol Street NW
Washington, DC 20001
(202) 756-8000
phughes@mwe.com

Debbie E. Green (TBN 24059852)
MCDERMOTT WILL & EMERY LLP
2501 North Harwood Street, Suite 1900
Dallas, TX 75201
(214) 295-8000
dgreen@mwe.com

*Counsel for Plaintiffs*